UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EUGENE KOTZ II                                              DEMAND FOR JURY TRIAL

v.

T-MOBILE USA, INC.

Defendant

_____/

### VERIFIED COMPLAINT

COMES NOW the Plaintiff, EUGENE KOTZ II, through undersigned counsel, (herein referred to as "Plaintiff" or "Kotz") and states in support as follows:

### NATURE OF THE ACTION

This is an action for COUNT I: VIOLATION OF THE FEDERAL COMMUNICATIONS ACT, COUNT II: NEGLIGENCE, COUNT III: GROSS NEGLIGENCE, COUNT IV: NEGLIGENT HIRING, RETENTION AND SUPERVISION, COUNT V: VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT.

### INTRODUCTION

1. This action arises out of T-Mobile USA, Inc.'s (hereinafter "T-Mobile") systemic and repeated failures to protect and safeguard its customers' highly sensitive personal and financial information against common, widely reported, and foreseeable attempts to illegally obtain such information.

2. As a result of T-Mobile's misconduct as alleged herein, including its gross negligence in protecting customer information, its negligent hiring and supervision

of customer support personnel, and its violations of federal and state laws designed to protect wireless service consumers, the Plaintiff lost 2.5 Ethereum (hereinafter "ETH"), 1.05985284 Bitcoin (hereinafter "BTC")[1], in lost property at the time of this filing, which occurred a result of an account takeover scheme (also known as a "SIM-swap"), which could not have occurred but for Defendant's intentional actions and negligent practices, as well as their repeated failure to adhere to federal law.

## PARTIES

3.      Plaintiff KOTZ is a resident of Cape Coral, Florida.

4.      The defendant is a Delaware corporation with a principal place of business in the State of Washington.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§1331, as this case arises under federal statutes, such as the Federal Communications Act ("FCA") at 47 U.S.C. §222, the Stored Communications Act ("SCA") at 18 U.S.C. §2701, and the Computer Fraud and Abuse Act ("CFAA") at 18 U.S.C. §1030.

6.      Furthermore, the Court has jurisdiction under 28 U.S.C. §1332 in that the amount in controversy exceeds $75,000.00, inclusive of attorney fees, costs, and statutory interest, and Plaintiff and Defendant are citizens of different states.

7.      The venue is proper in this court as the events relevant to this action occurred in the Lee County, which is located in the United States District Court for the Middle District of Florida.

---

[1] Due to being locked out of his Coinbase Account, Kotz does not have a print out at the time of filing showing 2.5 ETH, but may amend this complaint to add Coinbase at a later time if necessary.

2

8.      Defendant has established minimum contacts within Florida, subjecting them to jurisdiction herein.

**9.**     Plaintiff KOTZ has been a T-Mobile by Metro by PCS customer since approximately 2018 and has had the phone number ending in 5804.

10.     Defendant T-Mobile provided their services in Cape Coral, Florida and Plaintiff KOTZ utilized cell towers operated by Defendant in Cape Coral, Florida.

11.     T-Mobile, by operating, conducting, engaging in, or carrying on a business venture in the State of Florida, T-Mobile availed itself to the personal jurisdiction in the State of Florida, pursuant to section 48.193(1)(a), Florida Statutes.

12.     T-Mobile availed itself to the personal jurisdiction of the State of Florida by soliciting business within the State, pursuant to section 48.193(1)(f)(1), Florida Statutes.

13.     T-Mobile availed itself to personal jurisdiction in the State of Florida by engaging in substantial business activity within the state, pursuant to Section 48.193(2), Florida Statutes.

14.     T-Mobile's actual interactions establish a physical presence within the State of Florida. The commercial quality and interaction with businesses and individuals within the State of Florida establish a "plus" factor to establish sufficient minimum contacts. Cf. Roblor Mktg. Group, Inc. v. Gps Indus., Inc., 645 F. Supp. 2d 1130 (S.D. Fla. 2009).

## GENERAL BACKGROUND

15.  In 2014, the IRS issued Notice 2014-21, 2014-16 I.R.B. 938, explaining that virtual currency is treated as property for Federal income tax purposes.

16.  Accordingly, this lawsuit seeks the return of Kotz's property, or an equivalent sum in United States Dollars at the current valuation, as well as additional damages as

recoverable by statute for the gross negligence and/or criminal conduct of T-Mobile and its employees.

17.     T-Mobile markets and sells wireless cellular phone service through standardized wireless service plans via various retail locations, online sales, and over the telephone.

18.     T-Mobile has approximately 1,015 stores in Florida, including numerous stores in Southwest, Florida.

19.     The Defendant has a substantial advertising budget in Florida where it estimated they spend millions annually marketing their services to residents of South West Florida.

20.     T-Mobile maintains accounts for its wireless customers, enabling them to access information about the services they purchase from T-Mobile.

21.     It is widely recognized and has been widely publicized that mishandling of customer wireless accounts, including, but not limited to, allowing unauthorized access, can facilitate identity theft and related consumer harm.

22.     Numerous instances of mishandling of customer account information have occurred at T-Mobile.

23.     As one of the nation's largest wireless carriers, T-Mobile's operations must comply with various federal and state statutes, including (but not limited to) the Federal Communications Act ("FCA") 47 U.S.C. §222.

24.     The FCA obligates T-Mobile to protect the "confidential proprietary information of [its] customers" and "customer proprietary network information" (commonly referred to as "CPI" and "CPNI", respectively). See 47 U.S.C. §222(a), (c).

25.     The Federal Communications Commission ("FCC") has promulgated rules to implement Section 222 of the FCA "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." 1998 CPNI Order, 13 FCC Rcd. at 8195 ¶193; see also 47 C.F.R. §64.2001 et seq. ("CPNI Rules").

26.     The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. See 47 C.F.R. §64.2005.

27.     The CPNI Rules also require carriers to implement safeguards to protect customers' CPNI. See 47 C.F.R. §64.2009(b), (d), and (e).

28.     These safeguards include (a) training personnel "as to when they are and are not authorized to use CPNI"; (b) establishing "a supervisory review process regarding carrier compliance with the rules"; and (c) filing annual compliance certificates with the FCC. Id.

29.     The CPNI Rules further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." See 47 C.F.R. §64.2010(a).

30.     T-Mobile regularly holds itself out to the general public as a secure and reliable custodian of customer data, including customers' confidential financial and personal information.

31.     T-Mobile maintains that it uses a variety of "administrative, technical, contractual, and physical safeguards" to protect customers' data "against security

incidents, and illegal, fraudulent, or unauthorized activities; investigate suspicious traffic, cybersecurity threats or vulnerabilities, complaints, and claims; authenticate your credentials for account access and information and provide other security protections, as of August 9, 2021, *See* https://www.t-mobile.com/privacy-center/our-practices/privacy-policy.

32.　As an example, T-Mobile explicitly states that "when you contact us by phone or visit us in our stores, we have procedures in place to make sure that only the primary account holder or authorized users have access."

33.　Upon information and belief, T-Mobile's sales and marketing materials make similar representations regarding T-Mobile's alleged implementation of various safeguards to protect its customers' private information (as required by statutes).

34.　T-Mobile's deceptive statements are designed to cover up for the fact that it is aware that its security procedures can and do fall short of its expressed and implied representations and promises, as well as its statutory duties.

35.　Such failures, which lead to unauthorized access of customers' information, were entirely foreseeable by T-Mobile.

## SIM CARD SWITCH

36.　As T-Mobile is aware, various forms of account takeover fraud have been widely reported in the press, by government regulators (including the Federal Trade Commission ("FTC") and the FCC), academic publications, and multiple lawsuits across the country. These illegal schemes involve criminals and fraudsters gaining access to or "hijacking" customer wireless accounts, which often include sensitive personal and

financial information, to induce third parties to conduct transactions with individuals they believe to be legitimate or known to them.

37.     One of the most damaging and pervasive forms of account takeover fraud is known as a "SIM-Swap", whereby a third party (with the help of a wireless carrier like T-Mobile) is allowed to transfer access to a customer's cellular phone number from the customer's registered "subscriber identity module" card (or "SIM card") – to a SIM card controlled by the third party.

38.     A SIM Card has a complete record of a user's cell phone history, inclusive of text messages, calls, and any Apps which a user has downloaded.

39.     A SIM swap is when a hacker convinces a carrier to switch a phone number over to a SIM card they own. Once a hacker has access to the phone number then they control the text-based two-factor authentication checks specifically designed to add a layer of protection to sensitive accounts such as bank accounts, social media accounts, and email accounts.

40.     The wireless carrier, however, must effectuate the SIM card reassignment and, therefore, "SIM-swapping" is not an isolated criminal act, as it requires the wireless carrier's active involvement to swap the SIM containing information regarding its customer to an unauthorized person's phone.

41.     Indeed, unlike a direct hack of data, whereby a company like T-Mobile plays a more passive role, SIM-swaps are ultimately effectuated by the wireless carrier itself. For instance, in this case, it is T-Mobile that approved and allowed the SIM card change (without Plaintiff's authorization), as well as all of the subsequent telecommunication

activity that was used to access Plaintiff's online accounts and cause the injuries suffered by Plaintiff.

42.     As such, by directly or indirectly exceeding the authorized access to customer accounts, wireless carriers such as T-Mobile may be liable under state and federal statutes, such as the Federal Communications Act ("FCA").

43.     Once a third party has access to the legitimate user's SIM card data, it can then seamlessly impersonate that legitimate wireless customer (e.g., in communicating with others or contacting various vendors).

44.     A common target of SIM-swapping and account takeover fraud are individuals known or expected, to hold cryptocurrency, because account information is often contained on users' cellular phones, allowing criminals to transfer the legitimate user's cryptocurrency to an account the third-party controls.

45.     The Federal Communications investigated T-Mobile and on February 28, 2020, released a report which read as follows:

*The American public and federal law consider such information highly personal and sensitive—and justifiably so. As the Supreme Court has observed, location data associated with wireless service "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."[4] Section 222 of the Communications Act requires carriers to protect the confidentiality of certain customer data related to the provision of telecommunications service, including location information. The Commission has advised carriers that this duty requires them to take "every reasonable precaution" to safeguard their customers' information. The Commission has also warned carriers that the FCC would "[take] resolute enforcement action to ensure that the goals of section 222 are achieved.*

*Today, we do exactly that. In this Notice of Apparent Liability, we propose a penalty of $91,630,000 against T-Mobile USA, Inc. (T-Mobile or Company) for apparently violating section 222 of the Communications Act and the Commission's regulations governing the privacy of customer information. We find that T-Mobile apparently disclosed its customers' location information, without their consent, to third parties who were not*

*authorized to receive it. In addition, even after highly publicized incidents put the Company on notice that its safeguards for protecting customer location information were inadequate, T-Mobile apparently continued to sell access to its customers' location information for the better part of a year without putting in place reasonable safeguards—leaving its customers' data at unreasonable risk of unauthorized disclosure.*

46.    The prevalence of SIM-swap fraud and T-Mobile's knowledge of such fraud, including, but not limited to, that performed with the active participation of its employees, demonstrate that what happened with Plaintiff's account was neither an isolated incident nor an unforeseeable event.

47.    As a regulated wireless carrier, T-Mobile has a well-established duty – one which it freely acknowledges on its corporate website – to protect the security and privacy of CPI and CPNI from unauthorized access, and T-Mobile is obligated to certify its compliance with this mandate to the FCC every year.

48.    The FCA expressly restricts carriers like T-Mobile from unauthorized disclosure of CPNI.

## SECURITY MEASURES THAT T-MOBILE COULD HAVE TAKEN

49.    For many years T-Mobile has been fully aware of well-established solutions to deter and prevent illegal unauthorized SIM-swaps and resulting thefts, which it could easily have implemented well before Plaintiff's phone was SIM-swapped but failed and refused to implement. Had T-Mobile implemented any of the following low-cost and easy-to-implement technology solutions, Plaintiff would not have been the victim of an unauthorized SIM swap.

50.    <u>Text message</u>. T-Mobile could have simply sent Plaintiff a text message asking him to confirm whether he requested the SIM-swap. She would have replied "no" and T-Mobile would have then denied the hacker's SIM-swap request and could have

reported the fraud attempt to Plaintiff. T-Mobile regularly sends text messages to its customers for marketing purposes and asks customers to reply if they want to stop receiving such texts. T-Mobile has the ability to send such simple text messages to its customers requesting a reply.

51.   Voice biometrics. Often branded as "Voice ID," voice biometrics is a well-established and cost-effective technology that has been implemented by leading financial institutions (e.g., Chase, Wells Fargo, and Schwab) to prevent fraud by verifying customers' identities by comparing a caller's voice to a customer (or fraudster) voiceprint stored on file.

52.   Data sharing. Mobile phone carriers in other countries have implemented a "data sharing" solution to prevent theft once an unauthorized SIM-swap has occurred. In essence, the carriers allow financial institutions real-time access to their SIM-swap data so that the institution can block a requested currency transfer if there has been a SIM-swap within a specified time frame (e.g., within 48 hours of the transfer request), which together is a very strong indicator of fraud. The data sharing solution is widely known and used in the industry. Wired magazine published an article entitled "The SIM Swap Fix That the US isn't Using," which states in relevant part that "While foreign phone carriers are sharing data to stop SIM swap fraud, US carriers are dragging feet." Wired describes that even carriers in developing countries such as Mozambique implemented the solution within a few months of understanding the extent of the problem and that the Head of IT, Cyber Security & Core Data Networks at Vodacom reported that "[the solution] reduced their SIM swap fraud to nearly zero overnight". Such data sharing to combat fraud resulting from unauthorized SIM-swaps is widely

adopted and has given rise to several multimillion-dollar third-party aggregators, including Prove.com (formerly Payfone, Inc.) and Telesign Corporation, which license SIM-swap data from carriers and sell it as a risk management offering to banks. All four major carriers in the United Kingdom ("UK"), including British welecom, Vodafone, O2 and Three, provide their SIM swap data to Prove.com, which in turn sells services to banks to do real-time SIM-swap checks to prevent fraud at the time of their customers' high-risk transactions.

53.     If a phone was actually lost, which in this case it was not, then voice biometrics should have been employed. Also, a valid copy of a driver's license should be on file so that a T-Mobile professional trained in fraud prevention could verify the identity of the customer whether via zoom or in person. Upon information and belief, T-Mobile has Customer care representatives located in the Philippines, where the average call center wage is $2/hour. These employees can easily be bribed and/or actively participate in the crime itself. Store employees located in the United States can and have in the past been charged with SIM Swap crimes. T-Mobile essentially had no internal controls.

## T-MOBILE HAD A SOLUTION TO THE SIM SWAPPING PROBLEM THAT THEY FAILED TO IMPLEMENT

54.     On September 18, 2018, T-Mobile, AT&T, and Verizon publicly announced the joint business scheme they had been developing for months called "Project Verify," now known as ZenKey, to with the apparent intention to profit from the SIM-swap problem.[2] ZenKey has been live since September 17, 2020. ZenKey is marketed to consumers as an easier and more secure way to log into other online services, stating "Your carrier has

---

[2] https://krebsonsecurity.com/2018/09/u-s-mobile-giants-want-to-be-your-online-identity/

a unique ability to identify and protect your mobile identity." ZenKey's benefits page previously stated, which was subsequently changed, that **"SIM Swap Fraud has already cost businesses hundreds of millions of dollars and the threat is increasing. With ZenKey, fraudsters can no longer access your users' accounts based on stolen credentials and a simple SIM Swap. Instead, ZenKey requires new SIM cards and devices go through a robust recovery process that the user has set up beforehand. In addition to these built-in fraud prevention features, ZenKey also offers you two other options that identify when a users' SIM changes – one via API and one via an automatic event alert that you can subscribe to. (See attached Exhibit "A").**

55.     By not implementing even basic solutions to mitigate, let alone substantially reduce SIM-swap fraud, T-Mobile maintains a larger revenue opportunity for ZenKey. Upon information and belief, T-Mobile and its Zenkey partner-competitors have invested around $200 million, promote ZenKey, rather than implement simple solutions to broadly prevent unauthorized SIM -swaps.

56.     In Summary, T-Mobile could have implemented Voice biometrics, Text message verification, and data sharing as an easy inexpensive way to prevent SIM-Swaps. T-Mobile could have a policy that required Sim-Swaps to be done in person with a valid ID that cross-referenced an ID on file. T-Mobile could have implemented ZenKey for free for all its consumers, including Ms. Kotz, particularly since the existence of ZenKey shows that they were aware that Sim Swapping was an issue.

57.     The failure of T-Mobile to have proper safeguards and security measures as recommended by the FCC resulted in damages to Plaintiff in an amount to be determined at trial.

## SIM SWAPS HAVE OCCURRED BECAUSE OF THE
## INVOLVEMENT OF T-MOBILE EMPLOYEES SINCE 2018

58.    On July 18, 2018, The Pasco County Sheriff's office says their surveillance of the Discord server revealed that the group routinely paid employees at cellular phone companies to assist in their attacks and that they even discussed a plan to hack accounts belonging to the CEO of cryptocurrency exchange Gemini Trust Company.[3] Accordingly, the major carriers have been aware for years of this problem.

59.     On May 18, 2018, it was reported that T-Mobile was investigating a retail store employee who allegedly made unauthorized changes to a subscriber's account in an elaborate scheme to steal the customer's three-letter Instagram username. The modifications, which could have let the rogue employee empty bank accounts associated with the targeted T-Mobile subscriber, were made even though the victim customer already had taken steps recommended by the mobile carrier to help minimize the risks of account takeover.[4]

60.    A hacker cannot sim-swap without the assistance of an employee. T-Mobile employees are either part of the act and guilty or not trained enough to verify the plaintiff's identity. In short – Sim swapping is not an act that any customer service representative should have the access to perform. The request for Sim Swap is something that should be escalated to a security department where staff is trained to identify hackers and/or trained to verify the plaintiff's identification.

---

[3] https://krebsonsecurity.com/2018/08/florida-man-arrested-in-sim-swap-conspiracy/
[4] https://krebsonsecurity.com/2018/05/t-mobile-employee-made-unauthorized-sim-swap-to-steal-instagram-account/

61.    The FCC announced in August 2021 that it will investigate a data breach disclosed by T-Mobile which impacted more than 47 million current, former and prospective customers[5]. T-Mobile has admitted that personal data, including social security numbers and driver's license information, of more than 40 million former and prospective customers was stolen along with data from 7.8 million existing T-Mobile wireless customers.

## FACTUAL ALLEGATIONS

62.    Plaintiff KOTZ has been a T-Mobile by Metro by PCS customer since approximately 2018.

63.    Kotz is a licensed electrical engineer Summit Energy Partners

64.    Plaintiff was using his phone on or about August 23, 2021, when suddenly he had no service.

65.    The following morning Kotz drove to a T-Mobile store located at 330 West James Lee Boulevard Crestview, Florida 32536, and was told by a representative that there were $200 in charges for device changes which Kotz did not authorize[6].

66.    Also, Kotz did not receive any text-message notifications that a change had been made to his account.

67.    Kotz subsequently learned that the hackers changed the password to his yahoo account and put a filter to block both messages from both his Binance and Coinbase Accounts. Kotz recovered emails that had been sent to the trash in his yahoo account.

---

[5] https://www.reuters.com/technology/hackers-steal-some-personal-data-about-78-mln-t-mobile-customers-2021-08-18/
[6] On August 24, 2021, the hackers directed Wells Fargo to transfer $15,000 to Coinbase. Kotz's decisive actions blocked the transfer from occurring.

68.    During the breach, the hackers logged into KOTZ's Coinbase and Binance Account and changed the password.

69.    The hackers exported 2.5 ETH (See attached Exhibit "B") and 1.05985284 Btc (See attached Exhibit "C") to a remote digital wallet.

70.    At the Metro PCS store, an employee ported the number back to Kotz despite not requiring Kotz to provide identification.

71.    Kotz reset his password in-store by literally telling a representative whom a store employee called over the phone, alerting them of his new password. There was never an option to discreetly enter his own password.

72.    The lack of security procedure allowed representatives from T-Mobile to access the account and/or change Kotz's password at any time.

73.    Subsequently, KOTZ needed to reset his Yahoo Password since the hackers were able to access his account during the breach.

74.    Kotz also had to change all passwords to all email accounts, all passwords to Apps, and all passwords to Cryptocurrency Accounts. However, Kotz is still locked out of his Coinbase Account.

75.    T-Mobile personnel should have been trained properly in order to inform KOTZ to immediately freeze all his accounts and change all his passwords after he informed them of the data breach.

76.    Plaintiff is entitled to the value of his stolen property back, which was hacked from his account likely due either the active involvement or the active concealment of the bad acts of T-Mobile Employees.

77.    KOTZ was forced to place fraud alerts with all three credit bureaus.

78.     On November 15, 2021, Kotz has received an email from Turbo Tax saying that

his tax returns were accessed.



**Hi there. We're confirming that...**

**Your 2019 tax return was accessed.**

**If you made this update, there is nothing more to do. If you *did not* make this update, we
recommend you contact TurboTax Support at 800-944-8596.**

**Thanks,**
**The TurboTax Team**

79.     Accordingly, the hackers were able to access and steal Kotz's social security

number which is part of an individual filers tax return.

80.     Kotz has suffered through sleekness nights and has suffered untold emotional

distress due to the egregious actions of T-Mobile Employees and its officers.

**LACK OF SECURITY PROTOCOLS**

81.     T-Mobile has been on notice for years that their security measures were not

adequate. Despite this, sufficient security measures were not in place to prevent this SIM

Card swap and the corresponding theft.

82.     A SIM swapping attack is otherwise known as SIM splitting, SIMjacking, SIM

hijacking, and port-out scamming. It's a scam that happens when fraudsters use the

weakness of two-factor authentication and verification which involves the second step

of the process receiving a text message or phone call to your cell phone number.

83.    Despite this knowledge of inherent security flaws, T-Mobile and its Officers and directors acted with a conscious and reckless disregard of the security of customers, failing to ratify and implement policies that would protect its customers' accounts.

84.    A valid driver's license and a valid pin/security code could have been required to port a number to a new phone.

85.    The fact Kotz's number was ported over without the original Sim device being present and without a valid ID corroborating Kotz's identity point to either completely substandard security procedures or this being an inside job by a T-Mobile Representative.

86.    T-Mobile should require SIM Card swaps to only be authorized by a fraud department that has specialized training in identity verification.

87.    Also, every customer should have a picture on record that could corroborate the fact that a customer is who they claim to be.

88.    After the SIM Card Swap took place, T-Mobile Representatives should have advised KOTZ to check any brokerage accounts, bank accounts, crypto accounts, and immediately freeze/stop payments on all activity associated with those accounts.

89.    T-Mobile Representatives were either complicit with the theft, actively involved, or grossly negligent.

90.    T-Mobiles' officers and directors exhibited a conscious and reckless disregard for the security of its customers by failing to implement sufficient security protocols.

**CAUSES OF ACTION**
**COUNT I: VIOLATION OF THE FEDERAL COMMUNICATION ACT (FCA)**

91.     Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of this Complaint as if the same were fully set forth herein.

92.     The FCA regulates interstate telecommunications carriers, including T-Mobile

93.     T-Mobile is a "common carrier" or a "telecommunications carrier" engaged in interstate commerce by wire for the purpose of furnishing communication services within the meaning of Section 201(a) of the FCA. See 47 U.S.C. §201(a).

94.     As a "common carrier", T-Mobile is subject to the substantive requirements of Sections 201 through 222 of the FCA. See 47 U.S.C. §§201-222.

95.     Under Section 201(b) of the FCA, common carriers may implement only those practices, classifications, and regulations that are "just and reasonable" and practices that are "unjust or unreasonable" are unlawful.

96.     Section 206 of the FCA, entitled "Carriers' liability for damages" provides: In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

97.     SECTION 207 of the FCA, entitled "Recovery of damages" further provides:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make a complaint to the [FCC] as hereinafter provided for or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any

district court of the United States of competent jurisdiction; but
such person shall not have the right to pursue both remedies.

98.    Additionally, Section 222(c) of    the    FCA    explicitly    requires

that telecommunications carriers protect their customers' CPNI. See 47 U.S.C. §222(c).

99.    According to the CPNI Rules:

Safeguarding CPNI. Telecommunications carriers must take reasonable
measures to discover and protect against attempts to gain unauthorized
access to CPNI. Telecommunications carriers must properly authenticate
a customer prior to disclosing CPNI based on customer-initiated contact,
online account access, or an in-store visit.
                                                …

In-store access to CPNI. A telecommunications carrier may disclose
CPNI to a customer who, at a carrier's retail location, first presents to the
telecommunications carrier or its agent a valid photo ID matching the
customer's account information.

100.    T-Mobile violated its duties under Section 222 of the FCA by failing to protect

Plaintiff's CPI and CPNI by using, disclosing, or permitting access to Plaintiff's CPI and

CPNI without the consent, notice, and/or legal authorization of Plaintiff as required by

the FCA, in that upon information and belief:

a.    during an in-store visit, or over the phone, Plaintiff's CPI and CPNI were

disclosed to someone other than Plaintiff by an agent of Defendant;

b.    during an in-store visit, or over the phone, Plaintiff's CPI and CPNI were

disclosed to someone, who was not properly authenticated by Defendant; during an in-

store visit, or over the phone, Plaintiff's CPI and CPNI were disclosed to someone, who

did not first present a valid photo ID to Defendant.

101.    T-Mobile violated the FCA, including Section 222, by allowing an unauthorized

party to access Plaintiff's CPI and CPNI.

102.     As alleged herein, T-Mobile failed to protect the confidentiality of Plaintiff's CPI and CPNI when it disclosed Plaintiff's CPNI and CPI to third parties without Plaintiff's authorization or permission.

103.     T-Mobile is also liable for the acts, omissions, and/or failures, as alleged herein, or its officers, employees, agents, or any other persons acting for or on behalf of T-Mobile.

104.     T-Mobile's violation of the FCA allowed unauthorized parties to impersonate Plaintiff in transactions with others.

105.     As a direct consequence of T-Mobile's violations of the FCA, Plaintiff has been damaged through the loss of his property. In particular, T-Mobile failed to establish and implement reasonable policies, procedures and safeguards governing the creation, access, and authentication of user credentials to access customers' accounts, creating an unreasonable risk of unauthorized access.

106.     T-Mobile, by its inadequate procedures, practices, and regulations, engages in practices which, when taken together:

a.     fail to provide reasonable, appropriate, and sufficient security to prevent unauthorized access to its customers' wireless accounts;

b.     allow unauthorized persons to be authenticated; and

c.     grant access to sensitive customer account information.

107.     As such, in violation of the FCA, T-Mobile has failed to ensure that only authorized persons have access to customer account data and that customers' CPI and CPNI are secure.

108.     Among other things, T-Mobile:

a.      failed to establish and enforce rules and procedures sufficient to ensure only authorized persons have access to T-Mobile customer accounts, including that of Plaintiff;

b.      failed to establish appropriate rules, policies and procedures for the supervision and control of its officers, agents and employees;

c.      failed to establish and enforce rules and procedures, or provide adequate supervision or training sufficient to ensure that its employees and agents follow such rules and procedures, to restrict access by unauthorized persons;

d.      failed to establish and enforce rules and procedures to ensure T-Mobile's employees and agents adhere to the security instructions of customers concerning accessing customers' accounts, including that of Plaintiff;

e.      failed to adequately safeguard and protect its customers' wireless accounts;

f.      permitted the sharing of and access to user credentials among T-Mobile's agents or employees without a pending request from the customer, reducing the likely detection of and accountability for unauthorized access;

f.      failed to appropriately supervise employees and agents, who granted unauthorized access to customers' accounts, including that of Plaintiff;

g.      failed to adequately train and supervise its employees, officers, and agents to prevent unauthorized access to customer accounts;

h.      failed to prevent the ability of employees, officers and agents to access and make changes to customer accounts without specific customer authorization;

i.      allowed "porting out" of cell phone numbers without properly confirming that the request was coming from legitimate customers;

j.      lacked proper monitoring and, therefore, failed to monitor its systems for the presence of unauthorized access in a manner that would allow T-Mobile to detect intrusions, breaches of security, and unauthorized access to customer information;

k.      failed to implement and maintain readily available best practices to safeguard customer information (and indeed, seemed to suggest such practices were only available to those customers who "paid for" the privilege of having their information secured);

l.      failed to timely diagnose and determine the cause of Plaintiff's service interruption;

m.      failed to timely notify Plaintiff of the cause of Plaintiff's service interruption; and

n.      failed to implement and maintain internal controls to help protect against account takeovers and SIM-swaps by unauthorized persons. The inadequate security measures, policies, and safeguards employed by T-Mobile created a foreseeable and unreasonable risk of unauthorized access to the accounts of its customers, including that of Plaintiff.

109.    Upon information and belief, T-Mobile has been long aware of its inadequate security measures, policies, and safeguards, and nevertheless, induced customers into believing that its systems were secure and compliant with applicable law.

110.    T-Mobile, despite knowing the risks associated with unauthorized access to customer accounts, failed to utilize reasonable and available methods to prevent or limit such unauthorized access.

111.   T-Mobile failed in its duty to protect and safeguard customer information and data pursuant to federal law.

112.   Had T-Mobile implemented appropriate and reasonable security measures, Plaintiff would not have been damaged.

113.   In sum, Defendant's security measures were entirely inadequate to prevent the foreseeable damage caused to Plaintiff.

## COUNT II: NEGLIGENCE

114.   Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of this Complaint as if the same were fully set forth herein.

115.   T-Mobile owes a duty of care to its customers to ensure the privacy and confidentiality of CPI and CPNI during its provision of wireless carrier services, as required by both federal and state law.

116.   By allowing unauthorized access to the personal and confidential information of legitimate T-Mobile customers, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

117.   By failing to timely and properly diagnose the cause of Plaintiff's service interruption, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

118.   But for the inadequate security protocols, practices, and procedures employed by T-Mobile in protecting customer data, including Plaintiff's private and confidential information, Plaintiff would not have suffered any damage.

119.    But for the inadequate protocols, practices, and procedures employed by T-Mobile in diagnosing the causes of customers' service interruptions, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

120.    But for those intentional actions and/or inaction of Defendant and its agents, Plaintiff would not have suffered damages.

121.    And but for T-Mobile's inability to quickly and effectively diagnose and/or determine that Plaintiff's account was compromised by a SIM Swap – a fact that T-Mobile should have known – Plaintiff would not have suffered damages.

122.    Plaintiff has been damaged through the loss of his property, 2.5 ETH and 1.05985284 BTC.

## COUNT III: GROSS NEGLIGENCE

123.    Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of this Complaint, as if the same were fully set forth herein.

124.    T-Mobile, as required by federal and state law, owed Plaintiff a duty to properly handle and safeguard Plaintiff's CPI and CPNI and access to his account.

125.    T-Mobile was required to ensure its compliance with federal law and to protect the confidentiality of its customers' account data, including that of Plaintiff.

126.    Upon information and belief, T-Mobile willfully disregarded and/or showed reckless indifference to its duties under federal and state law to T-Mobile customers and to foreseeable victims of T-Mobile's wrongful acts.

127.    Having superior knowledge of prior account takeover attacks on T-Mobile customers' data and having the ability to employ internal systems, procedures, and safeguards to prevent such attacks, T-Mobile nevertheless failed:

    a.    to institute appropriate controls to prevent unauthorized access to customers' accounts;

    b.    utilized authentication systems it knew or should have known were vulnerable to account takeover attacks;

    c.    willfully disregarded the best practices of the industry in failing to implement systems to thwart such attacks; and

    d.    failed to appropriately hire, retain, supervise, train and control those officers, agents and employees who could grant or obtain unauthorized access to customer account data.

128.    T-Mobile's policies, procedures and safeguards were completely ineffective and inadequate to prevent the unauthorized access to its customers' data, notwithstanding the requirements of the CFA, thus meeting the definition of gross negligence and warranting punitive damages.

129.    The grossly negligent conduct gives rise to punitive damages when it amounts to "despicable conduct" done with a "willful and conscious disregard" of the safety of others. *Civil Code § 3294(c)(1).*

## COUNT IV: NEGLIGENT HIRING, RETENTION AND SUPERVISION

130.    Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of this Complaint, as if the same were fully set forth herein.

131.    At all material times herein, T-Mobile's agents, officers, and employees, including, but not limited to, those directly or indirectly responsible for or involved in allowing unauthorized access to Plaintiff's confidential and proprietary account information, were under T-Mobile's direct supervision and control.

132.   Upon information and belief, T-Mobile negligently hired, retained, controlled, trained and supervised the officers, agents and employees under its control, or knew or should have known that such officers, agents and employees could allow unauthorized access to customer accounts, including that of Plaintiff.

133.   Upon information and belief, T-Mobile negligently failed to implement systems and procedures necessary to prevent its officers, agents and employees from allowing or obtaining unauthorized access to customer accounts, including that of Plaintiff.

134.   Upon information and belief, T-Mobile's negligent hiring, retention, control, training and supervision allowed the unauthorized access to customers' accounts resulting in damage to T-Mobile customers and foreseeable victims in the public at large, including Plaintiff.

135.   Given T-Mobile's experience with account takeover and SIM-swap attacks (including some perpetrated and/or assisted by Defendant's own employees, officers or agents), T-Mobile's failure to exercise reasonable care in screening, supervising, and controlling its officers, agents and employees was a breach of its duty to its customers, including Plaintiff.

136.   T-Mobile's duty to its customers and foreseeable victims to protect its customers' data from unauthorized access is required by federal and state law.

137.   It was entirely foreseeable to T-Mobile that unauthorized persons would attempt to gain unauthorized access to T-Mobile customers' data and, despite this, T-Mobile failed to implement sufficient safeguards and procedures to prevent its officers, agents and employees from granting or obtaining such unauthorized access.

138. Upon information and belief, T-Mobile engaged in the acts alleged herein and/or condoned, permitted, authorized and/or ratified the conduct of its officers, agents and employees.

139. As a direct consequence of T-Mobile's negligent hiring, retention, control and supervision of its officers, agents, and employees, who enabled or obtained the unauthorized access to Plaintiff's account, Plaintiff was damaged through the loss of his property.

**COUNT V: VIOLATIONS OF THE
COMPUTER FRAUD AND ABUSE ACT**

140. Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of this Complaint as if the same were fully set forth herein.

141. The CFAA governs those who intentionally access computers without authorization or who intentionally exceed authorized access and as a result of such conduct, cause damage and loss.

142. As alleged herein, a SIM-swap attack requires the intentional access to customer computer data by T-Mobile which exceeds its authority, and which conduct causes damage and loss. As such, T-Mobile is subject to the provisions of the CFAA.

143. T-Mobile's conduct, as alleged herein, constitutes a knowing violation of the CFAA.

144. T-Mobile is also liable for the acts, omissions, and/or failures, as alleged herein, of any of its officers, employees, agents, or any other person acting for on behalf of T-Mobile.

145. T-Mobile violated its duty under the CFAA by exceeding its authority to access the computer data and breach the confidentiality of the proprietary information of

Plaintiff using, disclosing, or permitting access to Plaintiff's CPNI without the consent, notice, and/or legal authorization of KOTZ as required by the CFAA.

146.     Section 1030(g) of the CFAA provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage….

147.     Plaintiff alleges she has suffered damages which exceed the threshold of $5,000.00 as required by Section 1030(c)(4)(A)(i)(I) of the CFAA.

148.     Plaintiff alleges T-Mobile's unlawful conduct has caused damage that exceeds $75,000.00, inclusive of attorneys' fees and costs.

149.     Plaintiff has brought this claim within two (2) years of the date of discovery of the damage pursuant to Section 1030(g) of the CFAA.

150.     Plaintiff discovered damage on or about August 24, 2021.

151.     Upon information and belief, T-Mobile's conduct as alleged herein constitutes a violation of Section (a)(5)(A) of the CFAA.

152.     Upon information and belief, T-Mobile's conduct as alleged herein may constitute a reckless violation of Section (a)(5)(B) of the CFAA.

153.     Upon information and belief, T-Mobile's conduct as alleged herein may constitute an intentional violation of Section (a)(5)(C) of the CFAA.

154.    As a direct consequence of T-Mobile's violations of the CFAA, Plaintiff has been

damaged in an amount to be proven at trial but, upon information and belief, plus fees

and costs, including reasonable attorneys' fees.

### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

155.    Plaintiff incorporates by reference all facts and allegations of paragraphs 1-90 of

this Complaint as if the same were fully set forth herein.

156.    Plaintiff seeks to have the Court declare that T-Mobile's customer agreement

(the "Agreement") as unconscionable and void against public policy under FL Statute §

672.302 (2016) and unenforceable in its entirety.

157.    This is an action for declaratory judgment, pursuant to 28 U.S.C. $2201 as it is

requested that this Court renders a decision as to the enforceability of the Arbitration

Agreement, which was not seen, read, or acquiesced to by the Plaintiff.

158.    Defendants seek to have Plaintiff waive his statutory rights, including the right

to punitive damages, despite the fact that T-Mobile engaged in criminal behavior.

159.    The substantive law chosen by Defendants strips the Plaintiff of their statutory

rights.

160.    Defendants' interest in this declaration of rights is actual, present, adverse and

antagonistic in fact to the Plaintiff's interest.

161.    By reason of the foregoing, an actual and justiciable controversy exists between

Plaintiff and the Defendants.

162.    The actual terms of the customer agreement state as follows:

**THIS MEANS THAT NEITHER OF US WILL SEEK ANY INDIRECT, SPECIAL, CONSEQUENTIAL, TREBLE, OR PUNITIVE DAMAGES FROM THE OTHER. THIS EXCLUSIVE REMEDY, LIMITATION AND WAIVER ALSO APPLIES TO ANY CLAIMS EITHER PARTY MAY**

**BRING AGAINST THE OTHER PARTY TO THE EXTENT THAT IT WOULD BE REQUIRED TO INDEMNIFY THAT PARTY FOR SUCH CLAIM. THIS LIMITATION AND WAIVER WILL APPLY REGARDLESS OF THE THEORY OF LIABILITY, WHETHER FRAUD, MISREPRESENTATION, BREACH OF CONTRACT, PERSONAL INJURY, NEGLIGENCE, PRODUCT LIABILITY, OR ANY OTHER THEORY.**

163.   Read literally, the Indemnity provision requires a consumer, such as Mr. Kotz, to hold T-Mobile harmless for T-Mobile's own negligence, deliberate behavior, gross negligence, statutory violations (including disclosure of CPNI under the FCA), fraud, "or any other theory," if the conduct is related to any service provided by T-Mobile.

164.   On its face, the indemnity provision in a contract of adhesion renders the entire Customer Agreement unconscionable and unenforceable because if defeats the entire purpose of the contract by making it impossible for consumers to bring claims against T-Mobile for the entire range of statutory rights to which a consumer, such as Mr. Kotz, is entitled.

165.   Indeed, the Indemnity provision alone would totally obviate T-Mobile's commitment to privacy in its Privacy Policy as well as its legal obligations under the FCA and the CPNI Rules. Because the entire Agreement is unenforceable because the central purpose of the Agreement is "tainted with illegality . . . [so that] the contract as a whole cannot be enforced," the arbitration provision in Paragraph 2.2 of the Agreement ("Arbitration Provision") is also unenforceable. *See*, *Armendariz*, 2428 Cal. 4th at 89-90. And when a contract or agreement, express or implied, is tainted with the vice of such illegality, no alleged right founded upon the contract or agreement can be enforced in a court of justice. 12 Am.Jur., Contracts, secs. 160, 209.

166.    T-Mobile's customer agreement is unconscionable and void against public policy under FL Statute § 672.302 (2016) and should be held to be unenforceable in its entirety. The agreement was presented to Mr. Kotz, like all other wireless users, on a take-it-or-leave-it basis.  Mr. Kotz had no ability to negotiate any terms of the agreement.

167.    In contrast, T-Mobile has virtually unlimited power over its customers, including Mr. Kotz, as demonstrated by the fact that it purports to hold Mr. Kotz and all other wireless users to the terms of an agreement that they may have never seen or read. The Terms of Service strips the consumer of basic rights while simultaneously allowing for criminal conduct on the part of the Defendant.

168.    "*Provisions in a contract providing for arbitration must be definite enough so that the parties at least have some idea as to what particular matters are to be submitted to arbitration* and set forth some procedures by which arbitration is to be effected.*" Malone & Hyde, Inc. v. RTC Transp., Inc*., 515 So. 2d 365, 366 (Fla. 4th DCA 1987). The Customer Agreement contains numerous unconscionable terms that renders it unenforceable in its entirety because its "central purpose . . . is tainted with illegality." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir. 2003) (holding invalid an agreement that obstructs the ability of customers to bring any claims against defendant). If required to arbitrate this claim, Mr. Kotz would be forced by the Damages Limitation to forego his entitlement to punitive damages for T-Mobile's fraud and negligence.

169.    T-Mobile had a company policy of not checking identification because it allowed for rapid expansion and growth. As a result, T-Mobile exposed millions of its users to repeated security breaches which drained their accounts of millions of dollars.

170.    Furthermore, T-Mobile had a store policy of not allowing customers to read the terms of the Agreement. Phones set up in stores are done by store employees and customers, such as Mr. Kotz, never had the opportunity to read the terms of the Agreement.

171.    The Arbitration Provision would require Mr. Kotz to forego the full range of damages to which he is entitled under the Federal Communications Act § 222. These defects render not only the Arbitration Provision, but also the entire Agreement, unenforceable.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for judgment against T-Mobile as follows:

A.  Enter judgment for plaintiff on all counts;

B.  A declaration that the Customer Agreement and Arbitration Clause are unenforceable;

C.  Award compensatory damages to Plaintiff arising from T-Mobile's negligence;

D.  Award statutory damages to Plaintiff for T-Mobile's FCA violations;

E.  Award punitive damages to Plaintiff for T-Mobiles gross negligence and the conscious and reckless disregard of its customer's data;

F.  Award statutory damages to Plaintiff for T-Mobile's CFAA violations;

G.  Award Plaintiff costs and reasonable attorneys' fees;

H.  Award Plaintiff prejudgment interest; and

I.  Award Plaintiff such other and further relief as this Court deems just, fair, and proper.

Plaintiff hereby demands a jury trial.

## VERIFICATION

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged

therein are true and correct to the best of my knowledge and belief.

**EUGENE KOTZ**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and complete copy of this document was electronically filed with the clerk of courts in the Middle District of Florida on the 4th day of January 2022.

Respectfully submitted,

Shrayer Law Firm, LLC.
912 South Andrews Avenue
Fort Lauderdale, FL 33316
Tel.   (954) 601-3732
Email: ghs@shrayerlaw.com

**/s/Glen H. Shrayer**

Glen H. Shrayer, Esq.
Fl Bar No. 57253